**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

**TRICIA ANN CARLSON**

v. 5:25-cv-323-NPM

**COMMISSIONER OF SOCIAL SECURITY**

---

## OPINION AND ORDER

Plaintiff Tricia Ann Carlson seeks judicial review of a denial of Social Security disability benefits. The Commissioner of the Social Security Administration filed the transcript of the administrative proceedings. (Doc. 11). Carlson filed an opening brief, and the Commissioner responded (Docs. 14, 21). Carlson fails to show any reversible error. The Commissioner's decision is affirmed.

### I. Eligibility for Disability Benefits and the Administration's Decision

#### A. Eligibility

The Social Security Act and related regulations define disability as the inability to do any substantial gainful activity by reason of one or more medically determinable physical or mental impairments that can be expected to result in death or that have lasted or can be expected to last for a continuous period of not less than twelve months.[1] Depending on its nature and severity, an impairment limits exertional abilities like walking or lifting, nonexertional abilities like seeing or

[1] *See* 42 U.S.C. §§ 416(i), 423(d), 1382c(a)(3); 20 C.F.R. § 416.905.

hearing, tolerances for workplace conditions like noise or fumes, or aptitudes necessary to do most jobs such as using judgment or dealing with people.[2] And when functional limitations preclude both a return to past work and doing any other work sufficiently available in the national economy (or an impairment meets or equals the severity criteria for a disabling impairment as defined in the regulatory "Listing of Impairments"), the person is disabled for purposes of the Act.[3]

### B. Factual and procedural history

On November 11, 2021, Carlson applied for supplemental security income. (Tr. 10, 205–210). She asserted an onset date of November 19, 2019, alleging disability due to the following: cervical stenosis, spondylosis, cervical radiculopathy, post-concussion syndrome, PTSD, anxiety, GERD, depression, chronic migraines, muscle spasm, osteoarthritis, herniated discs in the cervical spine, bulging disc in the lumbar spine, idiopathic spinal cord herniation in the thoracic region, and anemia. (Tr. 205–210, 247–248). As of the alleged onset date, Carlson was 32 years old and had earned her GED. (Tr. 55, 71). She previously worked as a machine operator and pharmacy technician. (Tr. 248–249).

---

[2] *See* 20 C.F.R. §§ 416.913(a)(2)(i)(A)–(D) (discussing the various categories of work-related abilities), 416.922(b) (providing examples of abilities and aptitudes necessary to do most jobs), 416.945(b)–(d) (discussing physical, mental, and other abilities that may be affected by an impairment).

[3] *See* 20 C.F.R. § 416.911(a).

On behalf of the administration, a state agency initially reviewed[4] and denied Carlson's application on May 2, 2023, and, upon reconsideration, on August 5, 2023. (Tr. 104–108, 110–113). Administrative Law Judge (ALJ) Kevin Detherage held a hearing during which Carlson was represented by an attorney. (Tr. 31–70). On March 8, 2024, the ALJ issued a decision finding Carlson not disabled. (Tr. 7–30). The administration's Appeals Council denied her request for review. (Tr. 1–6). She then brought the matter to this court, and the case is ripe for judicial review.

### C. The ALJ's decision

The ALJ must perform a five-step sequential evaluation to determine if a claimant is disabled. 20 C.F.R. § 416.920(a)(1). This five-step process determines:

> (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether these impairments meet or equal an impairment listed in the Listing of Impairments; (4) if not, whether the claimant has the residual functional capacity ("RFC") to perform his past relevant work; and (5) if not, whether, in light of [her] age, education, and work experience, the claimant can perform other work that exists in significant numbers in the national economy.

*Atha v. Comm'r*, 616 F. App'x 931, 933 (11th Cir. 2015);[5] *see also* 20 C.F.R. § 416.920(a)(4).

The governing regulations provide that the Social Security Administration

[4] In Florida, a federally funded state agency develops evidence and makes the initial determination whether a claimant is disabled. See 42 U.S.C. § 421(a); 20 C.F.R. § 416.903(a).

[5] Unless otherwise noted, this report accepts all alterations and omits all citations, footnotes, and internal quotation marks when it quotes judicial decisions.

conducts this "administrative review process in an informal, non-adversarial manner." 20 C.F.R. § 416.1400(b). Unlike judicial proceedings, Social Security Administration hearings "are inquisitorial rather than adversarial." *Washington v. Comm'r*, 906 F.3d 1353, 1364 (11th Cir. 2018). "Because Social Security hearings basically are inquisitorial in nature, it is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits." *Id.* Indeed, "at the hearing stage, the commissioner does not have a representative that appears 'before the ALJ to oppose the claim for benefits.'" *Id.* "Thus, the ALJ has a basic duty to develop a full and fair record. This is an onerous task, as the ALJ must scrupulously and conscientiously probe into, inquire of, and explore for all relevant facts." *Id.*

Nonetheless, while the claimant is relieved of the burden of production during step five as to whether there are enough jobs someone like the claimant can perform, the claimant otherwise has the burdens of production and persuasion throughout the process. *See* 20 C.F.R. §§ 416.200 (the claimant must supply evidence to prove eligibility); 416.912 (the claimant must prove disability); *see also Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005) (the regulations "place a very heavy burden on the claimant"). In short, the "overall burden of demonstrating the existence of a disability as defined by the Social Security Act unquestionably rests with the claimant." *Washington*, 906 F.3d at 1359.

At step one of the evaluation, the ALJ found Carlson had not engaged in

substantial gainful activity since November 11, 2021, her application date. (Tr. 12). At step two, the ALJ characterized Carlson's severe impairments as: degenerative disc disease of the cervical spine, status-post surgery; degenerative disc disease of the thoracic and lumbar spines, with sciatica; osteoarthritis; bilateral carpal tunnel syndrome, status-post surgical release; headaches/migraines; obesity; depression; anxiety; ADHD; PTSD; and substance use disorder. *Id.* At step three, the ALJ determined Carlson did not have an impairment or combination of impairments that met or medically equaled the severity of an agency-listed impairment. *Id.*

As a predicate to step four, the ALJ arrived at the following RFC:

> [T]he claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a), and which can be learned in 30 days and has a general education development (GED) scale reasoning level of one, two, or three as per the Dictionary of Occupational Titles (DOT). The claimant also requires the use of a cane for ambulation. She can occasionally stoop, kneel, crouch, and/or crawl, though the claimant can never climb ladders, ropes, and/or scaffolds. She can occasionally climb ramps and/or stairs. The claimant should avoid exposure to hazards, such as heights or machinery with moving parts. She can frequently reach (including overhead) with the upper extremities. The claimant can frequently handle and finger with the upper extremities. She can perform no production-rate-pace work. The claimant can also tolerate only occasional changes in routine workplace settings. She cannot engage in commercial driving. (Tr. 14–15).

Consequently, the ALJ found Carlson unable to perform her past relevant work.[6] (Tr. 21). At step five, the ALJ found Carlson could perform other work that exists in

[6] Past relevant work is substantial gainful activity done within the past five years and long enough for the claimant to learn its demands. *See* 20 C.F.R. § 416.960(b)(1). Substantial gainful activity is work activity involving significant physical or mental duties usually done for pay or profit, whether or not pay or profit is realized. *See* 20 C.F.R. §§ 416.910, 416.972.

significant numbers in the national economy. (Tr. 22). In support, a vocational expert testified that an individual of Carlson's age, education, work experience, and RFC can perform jobs within the following representative occupation:

- *Final Assembler*, DOT #713.687-018, sedentary, SVP 2, with 17,000 jobs.
- *Waxer*, DOT #779.687-038, sedentary, SVP 2, with 7,000 jobs;
- *Call Out Operator*, DOT #237.367-014, sedentary, SVP 2, with 8,500 jobs.[7]

(Tr. 23, 65). Thus, for purposes of the Act, the ALJ concluded Carlson was not disabled since November 11, 2021, the date Carlson's SSI application was filed. *Id.*

## II. Analysis

The issue on appeal is whether substantial evidence supports the ALJ's conclusion that the intensity, persistence, and limiting effects of Carlson's impairments were not as disabling as alleged.

### A. Standard of review

The court "may not decide the facts anew, make credibility determinations, or

[7] The DOT numbers refer to the Dictionary of Occupational Titles and its detailed explanations concerning each occupation's requirements. These descriptions include exertion and skill levels. Exertion refers to the work—in a purely physical sense—that the job requires, and it is divided into five categories: sedentary, light, medium, heavy, and very heavy. Skill refers to the time it takes—during or before a job, such as prior experience or education—to develop necessary abilities, and it is divided into three categories: unskilled, semiskilled, and skilled. The "SVP" (Specific Vocational Preparation) provides further subdivision of the three skill categories into nine levels: SVP 1 and 2 are unskilled; SVP 3 and 4 are semiskilled; and SVP 5 through 9 are skilled. The expert's job number was for the national economy.

reweigh the evidence." *Buckwalter v. Comm'r*, 997 F.3d 1127, 1132 (11th Cir. 2021). While the court must account for evidence both favorable and unfavorable to a disability finding and view the evidence as a whole, *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), our review of the administration's decision is limited to determining whether "it is supported by substantial evidence and based on proper legal standards." *Crawford v. Comm'r*, 363 F.3d 1155, 1158 (11th Cir. 2004).

Substantial evidence is a more-than-a-mere-scintilla standard. "It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019). "[T]he threshold for such evidentiary sufficiency is not high." *Id*. The inquiry is "case-by-case," and "defers to the presiding ALJ, who has seen the hearing up close." *Id*. at 108. In other words, a "presumption of validity attaches" to the ALJ's factual findings. *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987). And if supported by substantial evidence, the ALJ's findings of fact are conclusive. 42 U.S.C. § 405(g). This means we must affirm, even if we would have reached a contrary result as finder of fact, and even if we find that the evidence "preponderates against" the agency's decision. *Noble v. Comm'r*, 963 F.3d 1317, 1323 (11th Cir. 2020).

**B. The ALJ properly considered the effects of Carlson's impairments, and the RFC is supported by substantial evidence.**

Carlson argues that the ALJ's RFC fails to depict the "total limiting effects" of her impairments because the ALJ did not account for her testimony that she would

have to be absent from work one or more days per month due to the combined effects of her impairments. (Tr. 14 at 14–22). According to Carlson, the RFC is based upon the ALJ's conclusory and deficient analysis of the facts and is not logically bridged to the record. *Id.* at 16–17. Thus, Carlson asserts remand is necessary as the ALJ's opinion precludes a meaningful judicial review. *Id.* at 22.

A claimant's RFC is the most she can still do despite her limitations. 20 C.F.R. § 416.945(a). To determine a claimant's RFC, an ALJ must "consider the limiting effects of all [the claimant's] impairment(s), even those that are not severe[.]" 20 C.F.R. § 416.945(e). In other words, "[a]n RFC determination is an assessment, based on all relevant evidence, of a claimant's remaining ability to do work despite [her] impairments." *See Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). "In making this holistic assessment, the ALJ considers evidence such as the claimant's daily activities; the location, duration, frequency, and intensity of the claimant's pain or other symptoms; the type, dosage, effectiveness, and side effects of any medication or other treatment the claimant takes or has taken to alleviate pain or other symptoms; treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; any measures the claimant uses or has used to relieve pain or symptoms; and any other factors concerning the claimant's functional limitations and restrictions." *Cnossen v. Comm'r*, No. 2:22-cv-574-KCD, 2023 WL 5013394, *4 (M.D. Fla. Aug. 7, 2023).

Contrary to Carlson's claim, the record shows that the ALJ considered the "total limiting effects" of her impairments, and the ALJ's findings are supported by substantial evidence. The ALJ considered Carlson's testimony concerning the intensity, persistence, and limiting effects of her physical and mental impairments. (Tr. 15–16, 46–62, 258–259, 276–283). And while the ALJ found that Carlson's medically determinable impairments could reasonably be expected to cause the alleged symptoms, the ALJ concluded that the objective medical evidence and other evidence of record did not support Carlson's statements about the functional effects of her symptoms. (Tr. 16). Then the ALJ outlined the evidence that supports the RFC—nothing more is required.

Nevertheless, Carlson suggests that the ALJ's decision rests on an inscrutable analysis of her cervical and lumbar spine pain and her migraine headaches that fails to logically connect the ALJ's conclusions to any record evidence. (Doc. 14 at 18). To prove her point, Carlson divorces portions of the ALJ's reasoning from the overall discussion. *Id.* at 16-17, 20. But we must read the ALJ's decision as a whole. *See Raper v. Comm'r*, 89 F.4th 1261, 1275 (11th Cir. 2024).

On that score, a comprehensive reading of the ALJ's decision demonstrates that he sufficiently articulated his reasons for not fully crediting Carlson's allegations about her symptoms. With regard to Carlson's cervical and lumbar spine, the ALJ recognized her complaints of pain, numbness, weakness, and decreased

strength. For example, he noted that in November 2019, Carlson was in a motor vehicle accident that lacerated and dislocated her right upper extremity. She underwent surgery for the laceration. (Tr. 16, 332–333, 967). Despite having "no deformity" in her musculoskeletal system, by February 2020, Carlson began to experience "persistent pain" in her upper right extremity and was diagnosed with neuropathy. (Tr. 16–17, 487–493). Epidurals and cervical radiofrequency interventions were recommended for pain treatment. (Tr. 17, 525, 529, 545).

In 2021, Carlson underwent cervical radiofrequency thermal coagulation on the right and left sides of her spine at C5 through C7. (Tr. 536, 545). She reported 80% to 85% reduced neck pain, less headaches, and better range of motion in her neck. *Id.* Nevertheless, Carlson continued to experience decreased strength in her upper extremities (4/5), decreased range of motion in her cervical spine, numbness in both hands, and lower extremity weakness (3/5), tingling, and numbness. (Tr. 17, 517–518, 640). Further, MRIs showed "some flattening" of Carlson's spinal cord at T7-T8 of the thoracic spine, "significantly decreased" sensation in L4-L5 and L5-S1 dermatomes, and herniations in her cervical spine from C4 through C7. (Tr. 17, 641, 1372). Carlson also underwent surgery for bilateral carpal tunnel syndrome. (Tr. 18, 1091). The ALJ observed that by the time Carlson filed for SSI disability, her treatment records suggest that her most pressing concern involved her impairments of the neck and upper extremities. (Tr. 17).

Following a second motor vehicle accident in June 2022, Carlson's CT scans revealed signs of multilevel degenerative disc disease in her cervical spine. (Tr. 18, 1478–1585, 1593–1594). In December 2022, she underwent a multilevel anterior cervical discectomy and fusion, which resulted in "resolution of [her] left upper extremity radiculopathy and significant improvement in her baseline motor strength" with "improved" sensation despite some residual weakness involving her upper extremities. (Tr. 18, 1809–1872).

But by August 2023, Carlson reported issues with chronic pain and numbness in her extremities, reduced strength, diminished reflexes in her upper extremities, and sensory changes over the right forearm. (Tr. 18, 2158–2282). However, her gait was normal, and her upper-body strength was 4/5 to 5/5. (Tr. 19, 2166–2273, 2274–2282, 2357). MRI scans revealed that Carlson's cervical spine at C5-C6 had kyphotic angulation and chronic disc protrusion that caused "fairly severe stenosis with compression of the cord." Nevertheless, her lumbar spine was within normal limits, which led the neurosurgeon to conclude that he did not see "anything significant." (Tr. 19, 2357–2358).

The ALJ also considered Carlson's reports of pain when riding in a car, sitting and standing, and looking down when she writes, along with a third-party witness report from Carlson's mother—that Carlson is "exhausted all the time" and has "limitations on lifting," is in "constant neck and back pain," and experiences

"dexterity and balance issues." (Tr. 20, 258–265, 266–283, 284–291). The ALJ noted that Carlson's activities of daily living included preparing light meals, going to doctor's appointments, helping her seven-year-old daughter get ready for school, and laundering clothes. (Tr. 259–260).

Furthermore, the ALJ reviewed opinions from state agency consultants—both of whom found Carlson capable of a limited range of light work. (Tr. 21, 71–80, 82–93). However, the ALJ found their opinions to be only somewhat persuasive because neither consultative physician had the opportunity to review the most recent treatment records from Carlson's neurosurgeon and pain management doctor. (Tr. 21). The ALJ went on to explain that Carlson's testimony, which proved *somewhat* consistent with her function reports and her mother's reports, led him to find that additional limitations were appropriate. (Tr. 21, 284–289).

Finally, the ALJ reviewed an August 2022 "employee's work limitation/student excuse" form completed by chiropractor Amaro Exposito that appeared to state Carlson was unable to work. (Tr. 21, 1592). The ALJ found the statement unpersuasive because it was illegible for the most part and did not explain why Exposito believed Carlson was limited in her ability to work. *Id.*

Based on his review of the record, the ALJ concluded that Carlson had some considerable workplace limitations and therefore limited her to sedentary work due to residual deficits in her upper-extremity strength. (Tr. 20). He considered her

limitations related to her back and lower extremities, and as such, the ALJ determined Carlson required a cane for ambulation. *Id.* The ALJ explained that he does not dispute that Carlson has limitations, just not to the extent she claims. Indeed, Carlson testified her health had deteriorated to the point that she could lift less than ten pounds and would often drop things due to difficulty with grasping. Yet, the ALJ noted that record evidence showed she had retained strength in her upper extremities. Furthermore, Carlson claimed she could only stand or sit for 20 minutes at a time; however, the neurosurgeon opined that he did not see "anything significant" as it relates to Carlson's lumbar spine, and there was evidence of a normal gait.

On appeal, "[t]he question is not . . . whether [the] ALJ could have reasonably credited [a claimant's] testimony, but whether the ALJ was clearly wrong to discredit it." *Werner v. Comm'r*, 421 F. App'x 935, 938–939 (11th Cir. 2011). We find no such error here. The ALJ fully considered Carlson's subjective account of symptoms related to her cervical and lumbar spine, but found it was not entirely consistent with the evidence of record. Substantial evidence supports this finding, and the court is not at liberty to "decide the facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner." *Crawford v. Bisignano*, No. 8:25-cv-02354-SDM-AAS, 2026 WL 2190492, *6 (M.D. Fla. July 9, 2026).

With respect to her migraine headaches, Carlson takes issue with the ALJ's observation that the record evidence did not necessarily align with her report of

experiencing migraine headaches on a daily basis. (Doc. 14 at 20). Specifically, she argues that the ALJ's RFC contains no limitations related to off-task time. *Id.* This argument is without merit.

The ALJ considered Carlson's testimony that she experienced migraine headaches on a daily basis that lasted about an hour, along with her mother's report that Carlson experienced constant headaches. (Tr. 50–51, 284–291). But the ALJ concluded that medical and other evidence of record did not necessarily align with her testimony. (Tr. 21). Specifically, the ALJ considered that in August 2020, Carlson began reporting issues with migraine headache pain, and was also diagnosed with anxiety, ADHD, and PTSD between February 2020 and September 2021. (Tr. 17, 430). During this time, however, Carlson was reported to be "alert and oriented to person, place, and time," with normal mood, affect, and memory. (Tr. 17, 350, 379, 450, 911).

In late 2021, Carlson continued to complain of experiencing migraine headaches twice a week, but her memory and concentration were normal, as was her fund of knowledge. (Tr. 17, 607). Carlson was prescribed medication, and by January 2022, she reported that the medication was "working well" and her headaches were occurring only once per week. (Tr. 17, 624–625). Carlson's memory was intact; her insight and judgment remained fair, as did her concentration and attention span. (Tr. 1730–1731). In 2023, she presented to a new medical provider

and reported having migraine headaches only three to four times per month, and expressed a desire to begin taking medicine again for treatment of her headaches. (Tr. 1912–1914, 1918–1919). Despite the headaches, Carlson's neurologic and psychological exams yielded normal results. (Tr. 1918–1919, 2037–2038, 2377–2388). Additional psychiatric notes demonstrate that in August 2023, Carlson had good concentration and attention span, normal thought process, good insight and judgment, and an intact memory. (Tr. 2298–2301).

The ALJ also considered the state agency psychologist's opinions regarding Carlson's residual mental functional capacity, which he found somewhat persuasive. (Tr. 21, 71–79, 82–93). While both of these psychologists reviewed records that included information about her migraine headaches, neither doctor indicated that Carlson would be off task due to headaches. To the contrary, each psychologist opined that Carlson was capable of carrying out simple instructions, she could follow two- to three-step commands, and she could persist and maintain concentration for two-hour increments sufficient to complete an eight-hour workday. (Tr. 78, 92).

Carlson appears to suggest that having an impairment—migraine headaches—should necessarily result in the ALJ fully crediting her subjective account about her symptoms. However, ALJs evaluate the intensity, persistence, and limiting effects of a claimant's pain even if the underlying conditions are expected to cause pain. *See* 20 C.F.R. § 404.1529(c)(1) ("When the medical signs or

laboratory findings show that you have a medically determinable impairment(s) that could reasonably be expected to produce your symptoms, such as pain, we must then evaluate the intensity and persistence of your symptoms so that we can determine how your symptoms limit your capacity for work."). To be sure, "the mere existence of these impairments does not reveal the extent to which they limit [the claimant's] ability to work or undermine the ALJ's determination in that regard." *Moore*, 405 F.3d at 1213 n.6 (citing *McCruter v. Bowen*, 791 F.2d 1544, 1547 (11th Cir.1986) ("'severity' of a medically ascertained disability must be measured in terms of its effect upon ability to work")). Significantly, Carlson does not point to any other evidence of record that supports her contention that her migraine headaches require limitations related to off-task time. Therefore, she has failed to show that her migraines resulted in any limitation beyond those set forth in the RFC. *See Moore*, 405 F.3d at 1213 (even if the record could support a different RFC, when based on substantial evidence, the ALJ's determination will not be disturbed).

In sum, what matters is whether the ALJ provided sufficient reasoning for the court to conduct a meaningful review and determine whether substantial evidence supports the ALJ's decision as to the claimant's subjective complaints. *See Morrison v. Comm'r*, 660 F. App'x 829, 834 (11th Cir. 2016) ("The ALJ must state the grounds for his decision with clarity to enable us to conduct meaningful review."). There is enough here for a meaningful review. The ALJ's consideration of Carlson's

subjective complaints, treatment history, and other records shows that he considered her "total limiting effects," and the RFC rests upon more than a scintilla of relevant evidence that a reasonable person might accept as adequate. *See Pupo v. Comm'r*, 17 F.4th 1054, 1060 (11th Cir. 2021).

## III. Conclusion

Upon consideration of the submissions of the parties and the administrative record, substantial evidence supports the ALJ's decision, and there was either no error or no harmful error in the ALJ's application of the correct legal standards. Accordingly, the decision of the Commissioner is **AFFIRMED** pursuant to sentence four of 42 U.S.C. § 405(g), and the clerk is directed to enter judgment in the Commissioner's favor, terminate all scheduled events, and close the case.

**ORDERED** on August 25, 2026

NICHOLAS P. MIZELL
United States Magistrate Judge